IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

**JELINDA STEWART**,                                                                  **PLAINTIFF**

**v.**                                                      **CIVIL ACTION NO. 2:06cv137-KS-MTP**

**JERRY LOFTIN, in his individual
capacity and MISSISSIPPI TRANSPORTATION
COMMISSION,**                                                                  **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This cause is before the Court on a motion for summary judgment filed by Defendant Mississippi Transportation Commission, seeking dismissal of Plaintiff Jelinda Stewart's sexual discrimination, sexual harassment and retaliation claims. Because the Plaintiff has failed to demonstrate any genuine issue of material fact, her claims against the Defendant cannot survive summary judgment, and the motion [#75] should be granted.

### I. FACTUAL BACKGROUND

Plaintiff Jelinda Stewart ("Stewart") began working for the Mississippi Department of Transportation ("MDOT") in September 2003. Hired as a light vehicle equipment handler, she quickly exhibited professional adroitness, and was promoted to material handler within a year. By December 2005, she had received another promotion to administrative assistant I and an accompanying pay raise. She became an administrative assistant II in June 2007 and enjoyed another salary boost. While steadily rising in the ranks, Stewart received two across-the-board pay raises of $1,500, one in fiscal year 2006-2007 and another in 2007-2008. Yet her seemingly unimpeded assent ended abruptly with her resignation in February 2008. Stewart's reason for this

1

unexpected career move? "I believe that my career dream of moving up in the department has ended because of the complaints of sexual harassment I have made against my immediate supervisor, [Jerry] Loftin." *See* Pl.'s Corrected First Am. Compl. [Doc. 19] (Jan. 4, 2007).

In September 2003, Stewart was placed under the immediate supervision of Defendant Jerry Loftin who allegedly immediately began harassing her. At the end of her first week, she and Loftin were assigned to work at Glen's Pond near Gulfport. *See* Pl.'s Resp. Ex. A at 8 [Doc. 80] (May 29, 2008). One day, while driving back to Hattiesburg from Gulfport, Loftin allegedly told Stewart that she was a pretty lady, and that he wanted to take her out. *Id.* She initially just said no, but Stewart realized soon after that first assignment that he would "hit" on her any time they were alone. *Id.* at 9. She also realized that, sharing an office, they would be alone frequently, meaning Loftin's behavior would persist.

Stewart claims that Loftin continued to pursue her, despite her telling him that she did not date. *Id.* at 9. She avers that Loftin, aggravated at her refusals, would say "what's the matter, because I'm older," "I can go all night," and "I can sugar down your salt." *Id.* at 9. He allegedly picked up her coffee cup and remarked, "Its so sweet, I just want my lips to be where your lips have been." *Id.* She further claims that he told her about his relationship with Sabrina McDonald, another MDOT employee–how he bought her clothes and gave her $600 a month–and offered to do the same thing for Stewart: "Oh I'd love to take you and buy you some pretty clothes and pretty night gowns and some sexy lingerie, I'd love to do that for you. You need me to just take care of you." *Id.* at 9.

His comments escalated into physical touching in the spring of 2004 when the two were assigned to cut magnolia trees in Pearl River County. *Id.* at 15. According to Stewart, the two

were in a truck together when Loftin tried to grab her hand. *Id.* Stewart claims that she wanted to report the incident, but was too afraid of losing her job: she had often heard Loftin boast of his close ties to MDOT management and tell people "I may not get you in the wash, but I'll get you in the rinse." *Id*. Loftin's attempts at touching and kissing her were not always unsuccessful. One day while doing paperwork at her desk, Loftin allegedly "sneaked in and stuck his head around the side of the door" and kissed her on the cheek. *Id*. at 16. She "thought [she] was going to die." *Id.*

In September 2004, Stewart approached another supervisor Chris Bryan and asked to be transferred away from Loftin, but was told that she could not be reassigned without a reason. *Id.* at 19. On September 24, 2004, Bryan called a meeting with Loftin, supervisor Todd Jordan and human resources director Philip Coco to discuss the complaints he had received from Stewart and Teri Haynes.[1] *See* Pl.'s Corrected First Am. Compl.[Doc. 19] (Jan. 7, 2007). Stewart contends that this meeting did not stop Loftin's harassment, but when she questioned Coco about further action, he allegedly appeared unconcerned. *See* Pl.'s Resp. Ex. A at 22 [Doc. 80] (May 29, 2008). However he did tell Stewart and Haynes to write down their grievances, an instruction that led Stewart to believe he would forward them to the appropriate officials in Jackson. *Id.* at 28. She turned in her written statement to Coco on October 22. By this time, she had been transferred from Loftin to Bryan. *Id.* at 28.

Stewart worked under Bryan until July 2005 when she was reassigned to Larry Bennett and eventually promoted to administrative assistant. Under Bennett, Stewart's duties included entering equipment usage and materials usage reports for three counties and employee time sheet

---

[1]Haynes, a colleague of Stewart, reportedly also suffered sexual harassment by Loftin.

information for a few crews. In December 2005, Bennett announced his impending retirement, and MDOT began accepting applications for his position. *Id.* at 34. Stewart, learning that Loftin planned to apply, voiced her concerns to Coco about working under him again. *Id.* However Loftin got the job, and according to Stewart, started working in a small office with her in early February 2006. *Id.* at 36. Stewart claims that he told her approximately six times that he still loved her, and repeatedly remarked that they were going to be sweet to each other. *Id.* at 35. She complained to Coco again, but his purported inaction led her to call MDOT's human resources division in Jackson. *Id.* at 38. On March 8, 2006, Stewart went to see Carolyn Bell, Civil Rights Director of MDOT, to file a statement of complaint against Loftin. *See* Pl.'s Corrected First Am. Compl. [Doc. 19] (Jan. 4, 2007). Bell informed Stewart that she would be placed on paid administrative leave pending an investigation into her claims. *See* Pl.'s Resp. Ex. A at 39 [Doc.80] (May 29, 2008).

After three weeks, Stewart learned that the investigation was inconclusive, and returned to MDOT on March 30, 2006. *Id.* at 38. She was placed under Travis Boyle, where the number of counties assigned to her increased to fourteen and the number of crews to eight. She was also given over a year's worth of equipment usage reports to enter. *Id.* at 40.

On April 26, 2006, Stewart filed an EEOC Charge of Discrimination alleging sexual harassment by Loftin. *See* Pl.'s Corrected First Am. Compl. [Doc. 19] (Jan. 4, 2007). One month later she filed a complaint against Loftin in this Court, alleging sex discrimination and several state law tort claims. On December 1, 2006, Stewart received a right to sue letter permitting her to institute civil action under Title VII against MDOT.

On January 4, 2007, she amended her complaint to add MDOT as a defendant, charging it with sexual discrimination, sexual harassment and retaliation. Defendant Mississippi Transportation Commission ("MTC") was substituted for MDOT on September 17, 2007. MTC filed its motion for summary judgment on May 5, 2008.

## II. STANDARD OF REVIEW

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To support a motion for summary judgment, "the moving party … [has] the burden of showing the absence of a genuine issue as to any material fact." *Burleson v. Tex. Dept. of Criminal Justice,* 393 F.3d 577, 589 (5th Cir. 2004). Material facts are those that "could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (internal citations omitted). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party" on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the court views all evidence "in the light most favorable to the nonmoving party" and "draw[s] all reasonable inferences in its favor." *Breen v. Texas A&M Univ.*, 485 F.3d 325, 331 (5th Cir. 2007). If the movant satisfies its initial burden, then the burden shifts back to the nonmoving party to produce evidence indicating that a genuine issue of material fact exists for each essential element of its case. *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 246-47 (5th Cir. 2003). The nonmovant is not entitled to merely

rest on her pleadings, but must set forth "specific facts showing there is a genuine issue for trial." *DirecTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005). If the nonmovant responds and still "no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni v. General Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).

### III. APPLICATION AND ANALYSIS

#### *A. Timeliness of Plaintiff's EEOC Charge*

MTC contends that Stewart failed to file her EEOC charge within 180 days of the sexual harassment she allegedly suffered at the hands of Loftin, and consequently her Title VII harassment claim is time-barred.[2] Specifically, MTC takes issue with Stewart's reliance on acts that allegedly occurred before October 2004 to support her hostile work environment claim.

In response, Stewart asserts that the continuing violation doctrine allows her to prove her claim with Loftin's pre-October 2004 conduct, as long as some act contributing to the claim occurred within the filing period. She points to comments made by Loftin in February 2006–his expressions of continuing love for Stewart and his insistences that they be sweet to each other–as timely instances of harassment.[3] *See* Pl.'s Resp. Ex. A at 35 [Doc. 80] (May 29, 2008).

---

[2]"A Title VII claimaint must file charges with the EEOC within 180 days after the alleged illegal conduct. This time limit operates as a statute of limitations." *Hood v. Sears Roebuck & Co.*, 168 F.3d 231, 232 (5th Cir. 1999) (citations omitted). As noted *supra*, Stewart filed her EEOC Charge on April 26, 2006. In order for her Title VII claims not to be time-barred, an act of discrimination must have occurred on or after October 29, 2005.

[3]Stewart suggests that other acts by Loftin, although not "overtly sexual," contributed to her hostile work environment. These purported acts, occurring after her transfer away from Loftin in October 2004, supposedly establish the continuing nature of the violation. For example, she claims that, after being transferred, she found paperwork, a coffee cup and yard clippers missing from her locker. She contends that she later saw a coworker return the missing clippers to Loftin and thank him for lending them to him. She also contends that she saw Loftin using a coffee cup from Dandy Dan that had a faint outline of "Jo" written on the side, just like the one missing from her locker. *See* Pl.'s Resp. Ex. A at 28 [Doc. 80]

In *National Railroad Passenger Car v. Morgan*, the Supreme Court recognized the applicability of the continuing violation doctrine to hostile work environment claims. *Nat'l R.R. Passenger Car v. Morgan*, 536 U.S. 101, 115-18 (2002). A hostile work environment claim is composed of a series of separate acts, occurring over a period of days or years, that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). So long as an employee files her complaint while at least one act which comprises the hostile work environment claim is still timely, "the entire time period of the hostile work environment may be considered by the court for the purpose of determining liability." *Id.* at 117. To further clarify its position, the Supreme Court stated

> The following scenarios illustrate our point: (1) Acts on days 1-400 create a hostile work environment. The employee files the charge on day 401. Can the employee recover for that part of the hostile work environment that occurred in the first 100 days? (2) Acts contribute to a hostile environment on days 1-100 and on day 401, but there are no acts between days 101-400. Can the act occurring on day 401 pull the other acts in for the purposes of liability? In truth, all other things being equal, there is little difference between the two scenarios as a hostile environment constitutes one "unlawful employment practice" and it does not matter whether nothing occurred within the intervening 301 days so long as each act is part of the whole. Nor, if sufficient activity occurred by day 100 to make out a claim, does it matter that the employee knows on that day that an actionable claim happened; on day 401 all incidents are still part of the same claim. *On the other hand, if an act on day 401 had no relation to the acts between days 1-100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act*.

*Morgan*, 536 U.S. at 118 (emphasis added). For a plaintiff to use the continuing violation doctrine, she must show that the harassment constituted "a series of related acts." *See Pegram v.*

---

(May 29, 2008). The Court reviews the facts and makes reasonable inferences in the nonmovant's favor, but even with this mandate it cannot conclude that these alleged acts corroborate Stewart's hostile work environment claim.

*Honeywell, Inc.,* 361 F.3d 272, 279 (5th Cir.2004). The Fifth Circuit has identified three factors relevant to determining whether acts are sufficiently related to form a continuing violation: (1) whether the alleged acts involve the *same type of discrimination*, tending to connect them in a continuing violation; (2) whether the acts are in the *nature of recurring events*, or are more in the nature of isolated events; and (3) whether the acts have the *degree of permanence* that should alert an employee to assert her rights. *See Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 352 (5th Cir. 2001)(emphasis added). However, the "sufficiently related" element will not be satisfied if an employer intervenes in such a way as to separate the alleged instances into distinct claims. At least three factors are significant in determining whether an employer action can be described as "intervening": (1) whether the "pre and post-limitations period incidents involve[d] the same type of employment actions;"(2) whether they occurred "relatively frequently;" and (3) whether they were "perpetrated by the same managers." *Morgan*, 536 U.S. at 120.

In the present case, the Court finds that the timely alleged instances of harassment are not sufficiently linked to the past conduct so as to be part of the same hostile work environment. Loftin's comments about still loving Stewart and about the two being sweet to one another, while boorish and offensive, cannot be compared to his time barred actions. The remarks simply do not rise to the level necessary to relate back to the pre-October 2004 conduct, and standing alone, do not equal acts of harassment. Moreover, Stewart reported Loftin's conduct to her supervisor in October 2004 and was promptly transferred away from him. Her transfer, though temporary, amounts to an "intervening act" under the *Morgan* analysis. *See Holmes v. Utah, Dep't of Workforce Servs.*, 483 F.3d 1057, 1063 (10th Cir. 2007) (employee's transfer from office in which harassment occurred comprised an intervening act that separated her from allegedly hostile

work environment).[4] Because Stewart's work environment significantly changed after she left Loftin's supervision in October 2004, she cannot rely on acts falling outside the filing period to support her hostile work environment claim.

In making its decision, the Court is mindful of the policy underlying the continuing violation doctrine. "The focus in on what event, in fairness and logic, should have alerted the average lay person to act to protect his rights. At the same time, the mere perpetuation of the effects of time-barred discrimination does not constitute a violation of Title VII in the absence of independent actionable conduct occurring within the statutory period." *Celestine*, 266 F.3d at 352; *see Alldread v. City of Grenada*, 988 F.2d 1425, 1432 (5th Cir. 1993) ("[T]he premise underlying the continuing violation doctrine [is] the equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated.") Stewart's appeals to Coco and Bryan in the fall of 2004 suggest that she realized Loftin's conduct was actionable long before she filed her EEOC complaint. Though the Court in *Morgan* stated that an employee's knowledge that her employer's conduct is actionable did not preclude her from relying on it in a later-filed complaint, it also noted that such reliance was contingent upon asserting timely, sufficiently related allegations. Thus, this Court does not believe application of the continuing

---

[4]*See also Chelette v. State Farm Mut. Auto. Ins. Co.*, 2006 WL 2513918, at *8 (W.D. La. Aug. 29, 2006) (finding that employer's investigation and resolution of employee's sexual harassment complaint constituted an intervening act, thus preventing employee from relating a timely claim of discrimination back to earlier instances); *Costanzo v. U.S. Postal Service*, 2003 WL 1701998, at *11 (S.D.N.Y. Mar. 31, 2003) (finding that pre-transfer acts of alleged harassment were "no longer part of the same hostile environment claim" and employee could not recover for them). *But see Williams v. City of Chicago*, 325 F. Supp. 2d 867, 875 (N.D. Ill. 2004) (finding transfer that did not remove employee from discriminatory environment did not "significantly change her working conditions" and was therefore not an intervening act).

violation doctrine is appropriate in this case. *See Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir.1999) ("[W]here a pattern of harassment spreads out over years, and it is evident long before the plaintiff sues that he was a victim of actionable harassment, he can not reach back and base his suit on conduct that occurred outside the statute of limitations.")

### *B. Hostile Work Environment*

A prima facie case of supervisor sexual harassment requires four elements: "(1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a term, condition, or privilege of employment." *Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 163 (5th Cir. 2007) (internal quotations omitted). Stewart has sufficiently demonstrated that she was a member of a protected class and was exposed to unwelcome sexual harassment because of her sex.

To satisfy the fourth element, Stewart must show that the harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."[5] *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal citations

---

[5] In her brief opposing summary judgment, Stewart halfheartedly argues that she could advance a quid pro quo sexual harassment claim. A quid pro quo claim requires proof of a tangible employment action, "a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," and evidence that the tangible employment action resulted from acceptance or rejection of the supervisor's sexual advances. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). According to Stewart, she suffered a tangible employment action in the form of a constructive discharge: health problems, induced by her stressful working environment, forced her to resign. Because the Court does not believe Stewart was constructively discharged, and because Stewart alleges no other tangible employment actions, her tepid attempt at establishing a quid pro quo claim fails.

The Court does not agree that Stewart's voluntary resignation—submitted almost two years after her EEOC complaint was filed—amounted to a constructive discharge. Courts, in reviewing constructive discharge claims, ask whether "working conditions [became] so intolerable that a reasonable person in

omitted). The harassment must have created an environment that was both subjectively and objectively offensive. *Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005). Courts look at the totality of the circumstances to determine whether the objective element is satisfied, considering factors such as the frequency of the conduct, its severity, the degree to which it is physically threatening or humiliating as opposed to being a mere offensive utterance, and the degree to which it reasonably interferes with an employee's work performance. *Id.*

Able to rely only on conduct occurring within 180 days of her EEOC charge, Stewart cannot successfully establish the severe/pervasive element. Her hostile work environment claim rests solely on the approximately six times Loftin allegedly reaffirmed his love for her, and the approximately six times he allegedly told her they were going to be sweet to each other. Given that Stewart was only working under Loftin for a month before she was again relocated, his comments were arguably frequent. However they do not rise to the level of severity or pervasiveness necessary for a successful hostile work environment claim. *See Shepherd v. Comptroller of Pub. Accounts,* 168 F.3d 871 (5th Cir. 1999).

## *C. Retaliation*

To establish a prima facie case of retaliation, the plaintiff must show that: (1) she participated in an activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the materially adverse action. *Aryain v. Wal-Mart Stores Tex. LP*, --- F.3d ---, 2008 WL 2655792, at

---

the employee's position would have felt compelled to resign." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). Plaintiffs must show a greater degree of harassment than is required for a hostile work environment claim. *Lauderdale*, 512 F.3d at 167. Stewart's constructive discharge claim, based only on the facts asserted to establish a hostile work environment, must fail.

*8 (5th Cir. July 8, 2008). If the plaintiff makes a prima facie showing, the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for its employment action. *Mire v. Tex. Plumbing Supply Co., Inc.*, 2008 WL 2704573, at *4 (5th Cir. July 10, 2008); *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002). If the employer meets this onus of production, the burden shifts back to the plaintiff to prove that the employer's proffered reason is a pretext for an actual, retaliatory purpose. *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

The parties do not dispute that Stewart has satisfied the first element of a retaliation claim. Unquestionably her reporting of Loftin's alleged harassment to Carolyn Bell is an activity protected under Title VII. *See* 42 U.S.C. § 2000e-3(a).

As to the second element, the anti-retaliation provision of Title VII protects an individual against retaliation that produces an injury or harm. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). Whether an injury or harm has occurred is an objective inquiry. That is, an adverse employment action in the retaliation context is one that a "*reasonable employee* would have found [to be] materially adverse." *White*, 548 U.S. at 68. (internal quotations and citations omitted) (emphasis added). A materially adverse action is one that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* Emphasis on material adversity enables the courts "to separate significant from trivial harms," to distinguish the "petty slights or minor annoyances that often take place at work" from employer actions calculated to deter harassment victims from seeking redress. *Id.* The significance of any individual act of retaliation will necessarily depend on the particular circumstances. *Id.* at 69; *McCoy*, 492 F.3d at 560.

Stewart claims she experienced several materially adverse actions after filing her EEOC complaint: (1) she was placed on paid administrative leave for three weeks; (2) she was assigned a heavier workload and assumed more responsibility in her new position under Boyle; (3) when she returned from leave, she discovered that personal items were missing from her desk, the locks on her office had been changed and she was not allowed to close her office door; and (4) she was chastised by her bosses and ostracized by her co-workers for reporting the alleged harassment to Bell. The Court will review the significance of each of these alleged occurrences individually.

*1. Administrative Leave*

At their meeting on March 8, 2006, Bell informed Stewart that she would be placed on leave while her claims were investigated. Shortly thereafter Stewart learned the leave would be with pay. The Fifth Circuit has held that administrative leave can constitute an adverse employment action in some circumstances. *See McCoy*, 492 F.3d at 560 (acknowledging the potentially negative stigma surrounding police officers placed on administrative leave with pay). However, as other courts have recognized, this classification is not absolute.[6] The Court appreciates the reasons an employer may have for placing an employee on leave while it investigates possible violations. This practice, prevalent in many workplaces, protects the employee against additional harm and facilitates the investigative process. Stewart does not claim

---

[6]*See Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 786-87 (7th Cir. 2007) (paid administrative leave pending investigation and subsequent reinstatement does not constitute materially adverse action*); Peltier v. U.S.*, 388 F.3d 984, 988 (6th Cir. 2004) ("[A] suspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action."); *Breaux v. City of Garland*, 205 F.3d 150, 158, 164 (5th Cir. 2000) (holding that suspension with pay does not constitute an adverse employment action).

that her position or salary was impacted by the administrative leave. She continued to receive pay during her absence, and was not required to use any of her accumulated personal leave or major medical leave. She admits that she was reinstated—albeit reassigned to a different supervisor—after the harassment investigation was completed. Furthermore, she seems to have suffered no significant harm because of the leave. Thus, the Court finds her placement on administrative leave does not constitute a materially adverse action.

*2. Heavier Workload/ Increased Responsibility*

The Court next considers Stewart's transfer to Travis Boyle. Stewart worked as an administrative assistant under Bennett and Loftin. Her duties included entering equipment usage and materials usage reports for three counties and employee time sheet information for a few crews. Under Boyle, Stewart retained the position of administrative assistant, but the volume of her work increased—the number of counties assigned to her increased to fourteen, the number of crews to eight, and she was given over a year's worth of equipment usage reports to enter. Stewart admits that her wage and hours remained the same, and she does not allege that she viewed the move as a demotion, or that she was given demeaning or degrading assignments. Stewart admits that she knew she would have more responsibilities under Boyle, since he supervised many more counties and crews than Bennett. *See* Pl.'s Resp. Ex. A at 40 [Doc. 80] (May 29, 2008). Though she managed the workload well, receiving a promotion to administrative assistant II in 2007, she nevertheless maintains that her supervisors increased her duties to get rid of her.[7] While "a lateral reassignment to a position with equal pay could amount to a materially

---

[7]Stewart claims that William Parker told her she was being assigned so much work because her supervisors wanted to get rid of her. Parker maintains that he never said this. *See* Pl.'s Resp. Ex. A at 51 [Doc. 80] (May 29, 2008); Def.'s Rep. Ex. 1 [Doc. 85] (June 13, 2008).

adverse action in some circumstances," the Court does not believe that MDOT's transfer of Stewart would dissuade a reasonable employee in her situation from making or supporting a discrimination charge. *See Aryain*, 2008 WL 2655792, at *8 (holding that a requested lateral reassignment that did not involve demotion or pay cut did not amount to a materially adverse action); *Serna v. City of San Antonio*, 244 F.3d 479, 485 (5th Cir. 2001) (no adverse employment action where evidence does not objectively show a loss in compensation, duties or benefits, but only that employee was transferred from one position to another).[8]

Even if the Court found the heavier workload to be a materially adverse action, MTC has explained it with legitimate, nonretaliatory reasons. According to the Defendant, Boyle did not have an administrative assistant before Stewart, so other assistants in the office had to complete the paperwork generated by his crews. When Stewart arrived, she was given all this paperwork, allowing the other assistants to refocus on their own crews. *See* Def.'s Mot. Summ. J. Ex. 2 & 3 [Doc. 75] (May 1, 2008). The amount of work, while considerable, reflected the scope of Boyle's supervision. Stewart has not offered evidence to show these explanations are pretextual, thus her retaliation claim based on increased workload cannot survive.

---

[8]Numerous cases from other courts support this contention. *See, e.g. Brown v. Brody,* 199 F.3d 446, 455-56 (D.C.Cir. 1999) ("[T]he clear trend of authority… is to hold that a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A survey of the relevant case law shows that the authority requiring a clear showing of adversity in employee transfer decisions is both wide and deep.") (citations and quotations omitted); *Williams v. Bristol-Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir. 1996) ("[O]bviously a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either."); *Sabzevari v. Reliable Life Ins. Co.,* 2006 WL 2336909, at *3 (S.D. Tex. Aug. 10, 2006) (finding that a purely lateral transfer was not an adverse employment action).

15

*3. Changed Locks, Missing Personal Items, Open Door Requirement*

Stewart avers that the locks on her office door were changed while she was on leave, and that personal items were removed from her desk. She also claims that she was the only employee required by Boyle to keep her office door open at all times. Even viewing the facts in the light most favorable to Stewart, the Court simply cannot conclude that these allegations produced any significant harm or that they would have dissuaded a reasonable employee from making or supporting a charge of discrimination. A reasonable employee likely realizes that her office and its contents are technically the property of the employer, and may be altered or changed at any time. A reasonable employee may be upset to find that personal items had been removed from her desk during her absence, yet she would probably view this as nothing more than a petty slight. Disparate application of office policies like the open door requirement would cause minor annoyance, but it is difficult for this Court to see how it would dissuade a reasonable employee from pursuing a discrimination claim.

*4. Chastised by Supervisors, Ostracized by Co-workers*

The Court finally considers the alleged treatment of Stewart by her colleagues. Stewart claims that Phillip Coco and Sharpie Smith chastised her for reporting her harassment allegation to officials in Jackson. Smith purportedly called her a troublemaker and told her that he did not want to hear anything more about the "imaginary" writings she had penned in October 2004, while Coco told her he was upset that she had contacted Jackson and brought outsiders into the matter. *See* Pl.'s Resp. Ex. A at 49, Ex. R at 68 [Doc. 80] (May 29, 2008). Comments made by supervisors can amount to materially adverse actions. *See Fallon v. Potter*, 2008 WL 1943829, at

*3 (5th Cir. May 5, 2008) (finding that employer's comments threatening retaliation against employee if he did not withdraw his EEOC complaint could constitute a materially adverse action). However the Court does not believe that Coco and Smith's remarks amount to a materially adverse action. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *White*, 548 U.S. at 68. Unlike the employer in *Fallon*,[9] Coco and Smith did not threaten to prevent anyone from testifying for Stewart, nor did they encourage her to drop her charge. Their comments may have upset a reasonable employee in Stewart's position, but they would not have dissuaded her from pursuing a discrimination charge.

Stewart also maintains that Boyle instructed co-workers not to talk to her. Shortly after she returned from leave, two supervisors allegedly approached Stewart and informed her that, per Boyle's instruction, they were not to talk to her.[10] *See* Pl.'s Resp. Ex. R at 72, Ex. S at 73 [Doc. 80] (May 29, 2008). While the Court doubts that Boyle's alleged instructions constitute a materially adverse action, it refrains from deciding the issue because Boyle has offered legitimate, nonretaliatory reasons for his actions. When Stewart was working under Bennett, Boyle claims to have witnessed employees frequently gathering in her office to chat ("coffee pot socializing"). *See* Def.'s Mot. Summ. J. Ex. 3 [Doc. 75] (May 1, 2008). Hoping to curtail this

---

[9]The comments alleged in that case included: "You just keep filing those EEO complaints and I promise you one thing-there won't be a person in this post office to testify against me," "You need to call her [an EEOC officer] and talk to her so you can drop this EEO," "You need to tell her you don't need redress .... cause you're canceling the EEO complaint," and "You'll never have anyone in this post office stand up for you. If you continue to file these charges, I'll show you what you're up against."*Fallon v. Potter*, 2008 WL 1943829, at *3 (5th Cir. May 5, 2008).

[10]Parker and Gibson, the supervisors Stewart claims approached her on that day, assert that Boyle never instructed them not to speak to Stewart, only not to fraternize in her office during the workday. *See* Def.'s Rep. Exs. 1 & 2 [Doc. 85] (June 13, 2008).

practice and increase work productivity, Boyle instructed employees not to congregate in Stewart's office, as they had become accustomed to doing under Bennett. *Id.* With this legitimate explanation, the burden of proof shifts back to Stewart to demonstrate that it is a pretext, but she again fails to do so.

### III. CONCLUSION

Stewart's career at MDOT, while successful on paper, was marred by Loftin's offensive comments and conduct. While she claims that his behavior amounted to actionable sexual harassment, she failed to seek timely redress with the EEOC, a fact that prevents this Court from considering all the alleged instances of inappropriate behavior. Though the acts giving rise to her retaliation claim are timely, Stewart has not demonstrated that they amount to materially adverse actions. The Court questions MDOT's decision to place Loftin over Stewart again, given her past accusations against him. But it cannot simply reprimand employers for irresponsible behavior. In sum, Stewart has failed to raise any genuine issues of material fact sufficient for her claims to survive summary judgment.

IT IS, THEREFORE, ORDERED AND ADJUDGED that the motion for summary judgment [# 75] is **granted**.

SO ORDERED AND ADJUDGED on this, the 4th day of August, 2008.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE